FILED

2022 Apr-04  PM 01:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

STATE OF ALABAMA;
STATE OF FLORIDA;
STATE OF GEORGIA,

     *Plaintiff*,

     v.

ALEJANDRO MAYORKAS, Secretary
of the U.S. Department of Homeland
Security, in his official capacity; U.S.
DEPARTMENT OF HOMELAND
SECURITY; CHRIS MAGNUS,
Commissioner of U.S. Customs and
Border Protection, in his official capacity;
U.S. CUSTOMS AND BORDER
PROTECTION; TAE JOHNSON,
Acting Director of U.S. Immigration and
Customs Enforcement, in his official
capacity; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; UR M.
JADDOU, Director of U.S. Citizenship
and Immigration Services, in her official
capacity; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES; the
UNITED STATES OF AMERICA,

     *Defendants*.

_____/

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      "Congress has told DHS that it has to prioritize the removal of criminal aliens." Oral Arg. Tr. 21:9–22, *United States v. Texas*, 579 U.S. 547 (2016) (No. 15-674) (argument of Obama Administration Solicitor General Donald Verrilli).[1]

2.      While the Executive Branch generally has discretion to decide which aliens to detain and deport, that discretion is a function of the "vague and sweeping language employed by Congress" in the immigration laws. *Jean v. Nelson* (*Jean II*), 727 F.2d 957, 967 (11th Cir. 1984) (en banc); *see* U.S. Const. art. I, § 8.

3.      It follows that, when Congress uses language ordering immigration officials to take specific actions at specific times, those officials have a non-discretionary duty to do so.

4.      In 1988, Congress did just that. It instructed the Executive Branch to arrest, detain, and remove all aggravated felons. Pub. L. 100-690, § 7343, 102 Stat. 4181 (1988). The Executive Branch interpreted that provision, then codified in 8 U.S.C. § 1252(a)(2)(A) (1988), to "statutorily preclude[]" the federal government "from exercising discretion . . . to release" or to "refrain from instituting deportation proceedings" against aggravated felons. Whether the DOJ Criminal Division May Make Promises Not to Deport a Criminal Defendant or Witness, Genco Op. No. 93-80 (INS), 1993 WL 1504027, at *3 (1993).

---

[1] https://www.supremecourt.gov/oral_arguments/argument_transcripts/2015/15-674_b97d.pdf.

5.      In 1996, Congress—using nearly identical language—expanded that duty to cover the broader category of "criminal aliens." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, § 303, 110 Stat. 3009; 8 U.S.C. § 1226(c). It did so because it was "justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal proceedings in large numbers." *Demore v. Kim*, 538 U.S. 510, 513 (2003).

6.      At the same time, Congress sought to ensure that those apprehended and ultimately ordered removed by an immigration judge were actually deported. To accomplish that, it commanded the federal government to arrest, detain, and remove any alien with a final order of removal. Illegal Immigration Reform and Immigrant Responsibility Act § 305; 8 U.S.C. § 1231.

7.      The Biden Administration seeks to "dispense with" these acts of Congress. *Texas v. United States*, 6:21-cv-16, 2021 WL 3683913, at *36 (S.D. Tex. Aug. 19, 2021) (discussing the Biden Administration's ongoing violations of §§ 1226(c) and 1231(a)). It claims the discretion to decide for itself which aliens should be arrested, detained, and removed, even if its policy preferences directly conflict with the clear commands of Congress. And it has used that claimed discretion to allow illegal immigrants guilty of drug trafficking, burglary, and other serious crimes to return to our communities upon release from state custody rather than arresting and removing them as federal law requires.

8.      This unlawful practice is codified in a memorandum issued September 20, 2021 (the September memo), which became effective November 29, 2021. *See*

Ex. 1. The September memo asserts "broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders," even for removable aliens covered by express congressional commands. Ex. 1 at 3.

9.    Plaintiffs, the States of Alabama, Florida, and Georgia, seek vacatur of the September memo under the Administrative Procedure Act (APA) and a permanent injunction ending the Biden Administration's wholesale abdication of its statutory duties. They do so to prevent the irreparable harm caused by the unlawful release of convicted criminals into their communities.

## PARTIES

10.    Plaintiffs, the States of Alabama, Florida, and Georgia, are sovereign States and have the authority and responsibility to protect their public fiscs and the health, safety, and welfare of their citizens.

11.    Defendants are the United States, appointed officials of the U.S. government, and U.S. governmental agencies responsible for the issuance and implementation of the challenged memorandum.

12.    Plaintiffs sue Defendant the United States of America under 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1346.

13.    Defendant Department of Homeland Security (DHS) is the federal agency principally responsible for immigration enforcement. DHS oversees Defendants U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE), which are responsible for administering the challenged policy.

4

14.     Defendant Alejandro Mayorkas is the Secretary of DHS. Plaintiffs sue him in his official capacity.

15.     Defendant Tae Johnson is the Acting Director of ICE. Plaintiffs sue him in his official capacity.

16.     Defendant Chris Magnus is the Commissioner of CBP. Plaintiffs sue him in his official capacity.

17.     Defendant Ur M. Jaddou is the Director of USCIS. Plaintiffs sue her in her official capacity.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361 and 5 U.S.C. §§ 702–03.

19.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201–02, the Constitution, and the Court's equitable powers.

20.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff the State of Alabama is a resident of every judicial district in its sovereign territory, including this district (and division). *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).[2] Additionally, a substantial part of the events or omissions giving rise

---

[2] *Accord Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005); *see also Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) (explaining that "the state government . . . resides at every point within the boundaries of the state").

to Plaintiffs' claims occurred in this division because the Alabama Department of Corrections operates the St. Clair Correctional Facility in this division.

## FACTUAL BACKGROUND

### The Federal Immigration Scheme

21.    "[T]he Immigration and Nationality Act ('INA') establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985) (citations omitted).

22.    Aliens arriving at the border, either at a port of entry or caught crossing illegally, are governed by 8 U.S.C. § 1225. That provision sets out procedures for admitting, removing, and detaining arriving aliens. Arriving aliens are not the focus of this suit.

23.    Deportable aliens in the interior of the United States—the focus of this suit—are subject to different provisions. Section 1227(a) lays out the "classes of deportable aliens." Among others, these classes include any alien who is "[p]resent in violation of law." 8 U.S.C. § 1227(a)(1)(B). They also include aliens—even lawfully present aliens—who commit certain acts, including, for example, several criminal offenses. *Id.* § 1227(a)(2).

24.    Section 1226 governs the arrest of these aliens for removal proceedings before an immigration judge and the detention of these aliens during those proceedings. Subsection (a) sets the default rule. It provides that "an alien may be arrested or detained pending a decision on whether the alien is to be removed from the United States." *Id.* § 1226(a).

6

25.     Because subsection (a) uses the permissive "may," DHS has discretion not to arrest an alien governed by this provision. And even if DHS does arrest and detain an alien, § 1226(a)(2) grants DHS the authority to release the alien on bond or conditional parole.[3]

26.     Congress, however, created an exception to this default rule. Beginning in 1988, Congress instructed federal immigration authorities to prioritize the arrest, detention, and removal of aliens guilty of "aggravated felon[ies]." *See* Pub. L. 100-690, § 7343, 102 Stat. 4181 (1988); 8 U.S.C. § 1252(a)(2)(A) (1988). Specifically, instead of the general rule that an alien "may . . . be arrested and taken into custody," § 1252(a)(1) (1988), the statute stated that "[t]he Attorney General *shall* take into custody any alien convicted of an aggravated felony upon release of the alien" from criminal custody, § 1252(a)(2)(A) (1988). Section 1252(a)(2)(A)–(B) also specified that the Attorney General "may not release from custody" these aggravated felons once arrested.

27.     While that provision was in effect, the Department of Justice—then charged with immigration enforcement—interpreted it to "statutorily preclude[]" the federal government "from exercising discretion . . . to release the alien." Whether the DOJ Criminal Division May Make Promises Not to Deport a Criminal Defendant or Witness, Genco Op. No. 93-80 (INS), 1993 WL 1504027, at *3 (1993). The

---

[3] Section 1226 grants this authority to the "Attorney General." But many of the INA's references to the "Attorney General" are now understood to refer to the Secretary of DHS in light of the restructuring that occurred when Congress created DHS. *See La. Forestry Ass'n v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).

Department also interpreted that provision to "statutorily preclude[]" it from "refrain[ing] from instituting deportation proceedings" against aggravated felons. *Id.*

28.    In 1996, Congress became concerned with a "wholesale failure by the [Attorney General] to deal with increasing rates of criminal activity by aliens," *Demore*, 538 U.S. at 518, and "frustrated with the ability of . . . criminal aliens" to "avoid deportation," *In re Rojas*, 23 I. & N. Dec. 117, 122 (BIA 2001) (en banc). As a result, and against the backdrop of the Executive Branch's interpretation of the statute to remove enforcement discretion, Congress expanded § 1252(a)(2)(A) to include additional crimes and moved it to § 1226(c). Illegal Immigration Reform and Immigrant Responsibility Act of 1996 § 303.

29.    Section 1226(c) uses the same mandatory language as its predecessor statute. It states that DHS "shall take into custody any alien who" is a criminal alien "when the alien is released" from criminal custody. 8 U.S.C. § 1226(c)(1). And it states that DHS "may release" such an alien only under narrow circumstances. *Id.* § 1226(c)(2). Criminal aliens, for purposes of § 1226(c), include aliens who have committed crimes of moral turpitude, 8 U.S.C. §§ 1182(a)(2)(A), 1227(a)(2)(A)(i); crimes involving controlled substances, *id.* §§ 1182(a)(2)(A), 1227(a)(2)(B); human trafficking, *id.* § 1182(a)(2)(H); money laundering, *id.* § 1182(a)(2)(I); aggravated felonies, *id.* § 1227(a)(2)(A)(iii); and specified firearms offenses, *id.* § 1227(a)(2)(C), among others.

30.    The legislative history reflects "a consensus" that "there is just no place in America for non-U.S. citizens who commit criminal acts here." S. Rep. No. 104-

48, 1995 WL 170285, at *6 (1995); *see* Gerard Savaresse, Note, *When is When?: 8 U.S.C. § 1226(c) & the Requirements of Mandatory Detention*, 82 Fordham L. Rev. 285, 299–300 (2013).

31.     Congress recognized, however, that expanding immigration authorities' duties beyond aggravated felons would tax government resources. It thus included in the legislation creating § 1226(c) a provision called the "Transition Period Custody Rules." Illegal Immigration Reform and Immigrant Responsibility Act of 1996 § 303, 8 U.S.C. § 1226 note; *see Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (discussing this provision).[4]

32.     The Transition Period Custody Rules gave immigration officials, "not later than 10 days after the enactment" of § 1226(c), the option to "notif[y] in writing the Committees on the Judiciary" for the House and Senate "that there is insufficient detention space and [federal-immigration] personnel to carry out" § 1226(c). Illegal Immigration Reform and Immigrant Responsibility Act of 1996 § 303, 8 U.S.C. § 1226 note, 1252 nt. If immigration officials did so, they received a one-year reprieve from some requirements of § 1226(c), which they could renew for one more year by re-notifying Congress. *Id.* After that two-year period, however, Congress expected full compliance with the non-discretionary commands in § 1226(c).

---

[4] The Transition Period Custody Rules are reflected in what is called a "statutory note," which is part of the governing law. It is not legislative history. Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 Law Libr. J. 213, 214 (2020) ("Statutory notes are provisions of law placed after the text of a United States Code section. They exist throughout the United States Code and are valid law despite their location in the Code.").

33.    The Transition Period Custody Rules demonstrate what § 1226(c)'s text makes plain—§ 1226(c) is mandatory.

34.    Section 1368 likewise confirms that § 1226(c) is a mandatory duty. It requires DHS to report to Congress every six months "estimating the amount of detention space" required for three separate categories of aliens. 8 U.S.C. § 1368(b)(1). One category is § 1226(c) aliens, another is "inadmissible or deportable aliens in accordance with priorities." *Id.* In other words, Congress assumes that § 1226(c) aliens are distinct from those whom DHS has discretion to prioritize or deprioritize.

35.    Multiple Supreme Court decisions confirm that § 1226(c) is mandatory. In *Jennings v. Rodriguez*, the Court held "that § 1226(c) *mandates* detention of any alien falling within its scope." 138 S. Ct. 830, 847 (2018) (emphasis added). Similarly, in *Preap*, the Court held that "subsection (c)(1) limits subsection (a)'s first sentence by curbing the discretion to arrest: The Secretary *must* arrest those aliens guilty of a predicate offense." 139 S. Ct. at 966.

36.    Consistent with the text, history, and decisional law, the last two Administrations have agreed that § 1226(c) requires prioritizing the removal of criminal aliens. President Obama's Solicitor General stated that "Congress has told DHS that it has to prioritize the removal of criminal aliens." Oral Arg. Tr. 21:9–22, *United States v. Texas*, 579 U.S. 547 (2016) (No. 15-674). And, in briefs signed by President Trump's Solicitor General in *Preap*, DHS agreed that § 1226(c) created a "duty to arrest" criminal aliens and "eliminated all discretion." Br. of Pet'rs. at 23,

*Nielsen v. Preap*, 139 S. Ct. 954 (2019); Reply Br. of Pet'rs. at 2, *Nielsen v. Preap*, 139 S. Ct. 954 (2019).

37.     In the same legislation that created § 1226(c), Congress enacted § 1231(a). Illegal Immigration Reform and Immigrant Responsibility Act of 1996 § 305. Whereas § 1226 applies to aliens subject to removal, § 1231 applies to aliens for whom DHS has obtained a final order of removal.

38.     Section 1231(a) states that "the Attorney General shall remove the alien from the United States within a period of 90 days" and, "[d]uring the removal period, the Attorney General shall detain the alien." 8 U.S.C. § 1231(a)(1)(A), (2).

39.     Unlike § 1226, § 1231(a) applies to *any* alien with a final order of removal, not just criminal aliens. But like § 1226(c), § 1231(a) is part of "Congress's efforts" in the 1996 legislation "to protect the states, citizens, and legal immigrants from criminal illegal aliens." *Texas v. United States*, 2021 WL 3683913, at *4.

40.     And like § 1226(c), § 1231(a) is mandatory. *See Texas v. United States*, 2021 WL 3683913, at *27–34.

<u>State Cooperation with Federal Immigration Enforcement</u>

41.     Under *Arizona v. United States*, States are limited in their own immigration "enforcement activities." 567 U.S. 387, 410 (2012). Nonetheless, States "bear[] many of the consequences of unlawful immigration." *Id.* at 397.

42.     As a result, Plaintiffs rely on the federal government's enforcement of the INA in general and §§ 1226(c) and 1231(a) in particular to keep criminals off their streets.

43.     Under President Trump, any removable alien convicted of a crime or with pending criminal charges was a priority. Ex. 2 at 3. And President Obama's Administration agreed with the Trump Administration on the importance of immigration enforcement against criminals, including aliens who committed any felony, any "significant misdemeanor," such as "domestic violence," "sexual abuse or exploitation," "burglary," "unlawful possession or use of a firearm," "drug distribution or trafficking," or "driving under the influence," and aliens who were repeat offenders of even minor misdemeanors. Ex. 3 at 5.

44.     Relying on these consistent efforts by the federal government to remove criminals, and to do everything possible to ensure their efficacy, Plaintiffs have taken great efforts to ensure they cooperate with federal immigration authorities.

45.     Plaintiffs have entered several cooperation agreements with ICE to ensure that those in state and local criminal custody are transferred to ICE custody when their criminal detention ends.[5] Plaintiffs, themselves and through their political subdivisions, have dedicated resources and staff time to ensuring employees are available and properly trained to comply with these agreements. Plaintiffs have also enacted laws requiring cooperation with federal immigration authorities. *E.g.*, § 908.105, Fla. Stat.; Ga. Code Ann. § 36-80-23.

---

[5] Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act, U.S. Immigration & Customs Enforcement, https://www.ice.gov/identify-and-arrest/287g (last visited Mar. 31, 2022).

46.    Plaintiffs have good reasons for assisting the federal government in enforcing the immigration laws. In fiscal year 2020, which ended September 2020, ICE's Atlanta Office removed 9,137 aliens, ICE's Miami Office removed 7,046 aliens, and ICE's New Orleans Office, which is responsible for Alabama, removed 11,772 aliens.[6] In Atlanta, 5,889 were convicted criminals and 1,111 had pending criminal charges. In Miami, 3,476 were convicted criminals and 1,356 had pending criminal charges. In New Orleans, 5,188 were convicted criminals and 1,549 had pending criminal charges.

47.    Moreover, according to the federal government's own study of the recidivism rates of state prisoners, "68% of released prisoners [are] arrested [again] within 3 years, 79% within 6 years, and 83% within 9 years."[7] Further, because prisoners are often arrested numerous times after being released, the study found an average of five arrests per prisoner within the 9 years following release from state prison. Because of these high recidivism rates, the failure to remove criminal aliens necessarily results in additional crimes in Plaintiffs' territory, victimizing their citizenry and costing them public funds and essential law enforcement resources.

---

[6] Local Statistics, ERO FY 2020 Report, U.S. Immigration & Customs Enforcement (Oct. 2021), https://www.ice.gov/doclib/news/library/reports/annual-report/ero-fy20-localstatistics.pdf.

[7] Measuring Recidivism, Nat'l Inst. Just. (Feb. 20, 2008), https://nij.ojp.gov/topics/articles/measuring-recidivism#statistics.

<u>The Biden Administration's Actions</u>

48.     On his first day in office, President Biden issued Executive Order 13993, Revisions of Civil Immigration Enforcement Policies and Priorities, 86 Fed. Reg. 7,051 (Jan. 20, 2021). The same day, then-Acting DHS Secretary David Pekoske issued the Biden Administration's first non-enforcement policy. Ex. 4. That policy included a "100-day pause" on removals and halted most interior immigration enforcement. *Id.* at 2. The government implemented that policy with a second memorandum on February 18, 2021. Ex. 5.[8]

49.     In internal emails, senior officials at DHS, including Defendants named in this case, discussed the overwhelming reduction in immigration enforcement that these new policies would cause. Ex. 6.

50.     On September 30, 2021, Defendant Secretary Mayorkas issued the September memo, which became effective November 29, 2021. Ex. 1 at 2. The September memo rescinds and replaces the Biden Administration's previous non-enforcement policies. Ex. 1 at 7.[9]

---

[8] The States of Texas, Louisiana, Arizona, Montana, and Florida challenged these policies. *Texas v. United States*, 6:21-cv-16 (S.D. Tex.) (Texas and Louisiana); *Arizona v. DHS*, 2:21-cv-186 (D. Ariz.) (Arizona and Montana); *Florida v. United States*, 8:21-cv-541 (M.D. Fla.) (Florida). Those challenges are now moot.

[9] The States of Texas, Louisiana, Arizona, Montana, and Ohio have challenged the September memo. *Texas v. United States*, 6:21-cv-16 (S.D. Tex.) (Texas and Louisiana); *Arizona v. Biden*, 3:21-cv-314 (S.D. Ohio) (Arizona, Montana, and Ohio).

51.    The September memo, like nearly every immigration policy from this Administration, is designed to thwart immigration enforcement, even where that enforcement is required by federal statute.

52.    The memo asserts "broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders. Ex. 1 at 3. It states that "[t]he fact [that] an individual is a removable noncitizen . . . should not alone be the basis of an enforcement action against them." *Id.* at 3. And it sets forth categories of aliens who are "priorities" for immigration enforcement.

53.    The three priority categories are: (1) threats to national security, which are principally terrorists and spies; (2) threats to public safety, which are those engaging in "serious criminal conduct" as specified in the memo; and (3) threats to border security, which are those who entered the United States unlawfully after November 1, 2020. *Id.* at 4–5.

54.    The second category—threats to public safety—is at issue here. The September memo sets out a series of aggravating and mitigating factors that immigration officials should consider in deciding whether to take enforcement action. *Id.*

55.    Aggravating factors include things like "the gravity of the offense," "the nature and degree of harm caused," and the "prior criminal record" of the alien. *Id.*

56.    Mitigating factors include things like having an "advanced or tender age," a "lengthy presence in the United States," and the "time since [the] offense." *Id.*

57.     The September memo, however, does not prioritize the removal of aliens guilty of the criminal offenses covered by § 1226(c) or even attempt to explain away the government's legal obligation to do so. It thus asserts discretion where no discretion exists. *See Preap*, 139 S. Ct. at 966 (recognizing that immigration officials "*must* arrest those aliens guilty of a predicate offense").

58.     Nor does the September memo prioritize aliens with final orders of removal subject to § 1231(a) or acknowledge the government's obligation to do so.

59.     Federal officials' actions on the ground confirm that the government is flouting its legal obligations to remove aliens under §§ 1226(c) and 1231(a). Since President Biden took office, federal officials have sent emails stating that they would refuse to take custody of burglars, drug traffickers, and other serious criminals upon their release from state custody. Those refusals have continued under the September memo.

60.     Further, ICE has "told Texas that it was canceling deportation requests" for aliens guilty of "evading arrest," "drunken driving," "drug possession," and "domestic assault injuring a family member."[10]

61.     Similarly, news reports confirm that removable aliens with "drug conviction[s]" who were detained under President Trump are being released under

---

[10] Stephen Dinan, *DHS cancels deportation request for hit-and-run killer*, Wash. Times (Jan. 30, 2022), https://www.washingtontimes.com/news/2022/jan/30/dhs-cancels-deportation-request-hit-and-run-killer/.

President Biden.[11] These aliens are subject to mandatory arrest, detention, and removal because their convictions involve a controlled substance. 8 U.S.C. § 1226(c)(1) (discussing *id.* §§ 1182(a)(2), 1227(a)(2)(B)).

62.    On top of all of this, the Biden Administration is treating its non-enforcement policy as an affirmative benefit that removable aliens may invoke. "If a noncitizen or their representative believe they do not meet DHS' priorities for enforcement, detention, or removal, they are encouraged to first contact their local [ICE] field office to request a case review."[12] If the field office does not grant relief, "individuals may initiate the ICE Case Review process by emailing" a "Senior Reviewing Official."[13]

<u>Harm to Plaintiffs</u>

63.    States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. Those consequences are especially grave when it comes to criminal aliens.

64.    Plaintiffs spend over $100 million *per year* incarcerating illegal immigrants who commit crimes within their borders. They will spend more because of the criminals the Biden Administration is releasing instead of arresting, detaining,

---

[11] Joel Rose, *A key pillar of Biden's immigration policy is going on trial this week in Texas*, NPR (Feb. 22, 2022), https://www.npr.org/2022/02/22/1081635394/a-key-pillar-of-bidens-immigration-policy-is-going-on-trial-this-week-in-texas.

[12] Contact ICE About an Immigration/Detention Case, U.S. Immigration & Customs Enforcement, https://www.ice.gov/ICEcasereview (last visited Mar. 31, 2022).

[13] *Id.*

and removing them, especially given the high recidivism rates among released prisoners. *See* ¶ 47.

65.    Congress recognized these harms when it enacted § 1226(c). It considered the costs of "criminal alien[] . . . confinement" and acknowledged that criminal aliens "formed a rapidly rising share of state prison populations." *Demore*, 538 U.S. at 518.

66.    Moreover, Congress has separately recognized the great costs to the States of criminal-alien crime. Under 8 U.S.C. § 1231(i), the federal government compensates the States for costs associated with incarcerating illegal immigrants. This program, however, pays the States only pennies on the dollar.

67.    Beyond incarceration costs, criminal-alien crime causes Plaintiffs to expend resources on law enforcement efforts, victims' services, and mental-health and substance-abuse treatment.

68.    Plaintiffs will also expend more resources on the supervised release of aliens. A substantial portion of individuals released from state prison are supervised for a period of time. This supervision costs the States time and resources. When the federal government refuses to fulfill its duties under §§ 1226(c) and 1231(a), these costs increase.

69.    Finally, Plaintiffs have a parens patriae interest in the safety of their citizens and a duty to defend their citizens against the crime victimization that the federal government's violation of §§ 1226(c) and 1231(a) will cause. *See Florida v. Nelson*, No. 8:21-cv-2524, 2021 WL 6108948, at *9 (M.D. Fla. Dec. 22, 2021).

70.    Plaintiffs, therefore, seek relief from this Court.

## CLAIMS

### COUNT 1

**Agency action that is not in accordance with law
and is in excess of authority in violation of the APA**

71.     Plaintiffs repeat and incorporate by reference ¶¶ 1–70.

72.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

73.     The September memo asserts discretion to ignore non-discretionary statutory duties—namely, the duty to arrest, detain, and remove criminal aliens under 8 U.S.C. § 1226(c) and the duty to detain and remove aliens with an order of removal under 8 U.S.C. § 1231(a). In practice, the September memo is being applied in a way that violates these duties.

74.     Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 291 (2013).

75.     The September memo is contrary to law.

### COUNT 2

**Arbitrary and capricious agency action in violation of the APA**

76.     Plaintiffs repeat and incorporate by reference ¶¶ 1–70.

77.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

78.     The September memo is arbitrary and capricious for several reasons.

79.    Most fundamentally, Defendants "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The September memo does not even discuss § 1226(c) or § 1231(a).

80.    Similarly, the Defendants displayed no awareness that they have changed a longstanding position of the federal government, nor do they consider reliance interests. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). The previous two Administrations acknowledged that DHS must prioritize the arrest, detention, and removal of criminal aliens. ¶ 36.

81.    Nor does the September memo consider the substantial costs imposed on the States by ignoring §§ 1226(c) and 1231(a), a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).

82.    Finally, insofar as Defendants claim the September Memo is justified by resource constraints, this rationale is pretextual. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–74 (2019). As internal documents acknowledge, ¶ 49, the Biden Administration is intentionally reducing immigration enforcement for political reasons.

83.    The September memo is arbitrary and capricious.

## COUNT 3

**Failure to conduct notice and comment in violation of the APA**

84.    Plaintiffs repeat and incorporate by reference ¶¶ 1–70.

85.     The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

86.     Even assuming Defendants have discretion to depart from the clear requirements of §§ 1226(c) and 1231(a), establishing a policy of this kind at a minimum required notice and comment. *See Jean v. Nelson* (*Jean I*), 711 F.2d 1455, 1483 (11th Cir. 1983).[14]

87.     Notice and comment was required.

## COUNT 4

### Agency action unlawfully withheld or unreasonably delayed in violation of the APA

88.     Plaintiffs repeat and incorporate by reference ¶¶ 1–70.

89.     At a minimum, Defendants' refusal to comply with §§ 1226(c) and 1231(a) qualifies as agency action unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

## COUNT 5

### Violation of the INA and the Constitution

90.     Plaintiffs repeat and incorporate by reference ¶¶ 1–70.

---

[14] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean II*, 727 F.2d 957. But the reason the en banc court did not address the notice and comment argument is because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

91.    The APA aside, the federal government cannot ignore federal statutes, and there is a non-statutory cause of action to challenge the conduct described in Count 1. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (discussing "a long history of judicial review of illegal executive action").

## COUNT 6

### Declaratory judgment that the Biden Administration's policy is unlawful

92.    Plaintiffs repeat and incorporate by reference ¶¶ 1–70.

93.    For the same reasons described in Counts 1 and 5, Plaintiffs are entitled to a declaratory judgment that the Biden Administration is violating the law.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs ask the Court to:

a)  Hold unlawful and set aside the September memo.

b)  Issue permanent injunctive relief enjoining Defendants from enforcing the September memo.

c)  Compel the agency to comply with §§ 1226(c) and 1231(a) pursuant to 5 U.S.C. § 706.

d)  Issue declaratory relief declaring the September memo unlawful.

e)  Award Plaintiffs costs and reasonable attorney's fees.

f)  Award such other relief as the Court deems equitable and just.

Respectfully submitted,


Steve Marshall
ATTORNEY GENERAL OF ALABAMA

*/s/ Edmund G. LaCour*
Edmund G. LaCour Jr.
SOLICITOR GENERAL

Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 353-2196
edmund.lacour@alabamaag.gov

*Counsel for the State of Alabama*


Ashley Moody
ATTORNEY GENERAL OF FLORIDA

James H. Percival*
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY
*pro hac vice forthcoming

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

Christopher M. Carr
ATTORNEY GENERAL OF GEORGIA

Stephen J. Petrany*
SOLICITOR GENERAL
*pro hac vice forthcoming

Georgia Department of Law
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the State of Georgia*